UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


DWAYNE JOHNSON, REGINA      )
WHITE, MAKIA WHITE, and     )
DWAYNE JOHNSON, JR.,        )
                            )
   Plaintiffs,              )   Civil Action
                            )   No. 12-11344-RWZ
                            )
vs.                         )
                            )
LAWRENCE CELESTER as Police )
Officer of the City of      )
Boston and Individually, and)
LYNWOOD JENKINS as Police   )
Officer of the City of      )
Boston and individually, and)
THE CITY OF BOSTON,         )
                            )
   Defendants.              )


**TRIAL TESTIMONY OF OFF. DARRYL W. OWENS**


BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
November 12, 2015


\*   \*   \*   \*


CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
(617) 261-0555

APPEARANCES:

2

3      For the Plaintiffs:

4      MAHONEY & PAPPAS LLP
       By:  Charles S. Pappas, Esq., and
5           Joseph M. Mahaney, Esq.
            2 Pleasant Street
6           South Natick, MA 01760

7

8      For the Defendants:

9      CITY OF BOSTON LAW DEPARTMENT
       By:  Nicole M. O'Connor, Esq., and
10          Shane P. Early, Esq.
            One City Hall Plaza
11          Room 615
            Boston, MA 02201
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         I N D E X

3

 WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS
4
 OFF. DARRYL W. OWENS
5
    By Ms. O'Connor:       4                27
6    By Mr. Pappas:               18

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (TRIAL TESTIMONY OF OFF. DARRYL W. OWENS:)

2           OFF. DARRYL W. OWENS, SWORN.

3           COURTROOM DEPUTY CLERK URSO:  Sir, may I please ask

4    you to state your name, spelling your last for the record,

5    please, sir.

6           OFF. OWENS:  My name is Darryl W. Owens.  Last name

7    is O-w-e-n-s.

8           THE COURT:  Please be seated.

9           Members of the jury, when we finished on Tuesday, the

10   plaintiff had announced -- plaintiffs announced that they were

11   resting and what that says is that they have completed

12   presenting all of the evidence they intend to present to you.

13   They have a right in case something unusual happens during the

14   defendants' case to come back with rebuttal, but that is

15   highly unlikely.  So, we are now beginning the defense with

16   this witness who has just been sworn.  You may proceed.

17          MS. O'CONNOR:  Thank you, your Honor.

18                        DIRECT EXAMINATION

19    BY MS. O'CONNOR:

20   Q.   Good morning, Officer Owens.

21   A.   Good morning.

22   Q.   How long have you been a Boston police officer?

23   A.   I was appointed in November of 1989.

24   Q.   Currently what is your assignment with the Boston Police

25   Department?

1    A.   I am an academy instructor.

2    Q.   And as an academy instructor, what are your job duties?

3    A.   My job duties are to train in defensive tactics and use

4    of force.

5    Q.   Did you undergo any training to become an academy

6    instructor?

7    A.   Yes, I did.

8    Q.   What training is that?

9    A.   There is an MPTC course.  That's the Massachusetts

10   Criminal Justice Training Committee course.  It's a state

11   course.  It was a twelve-day course, twelve eight-hour days,

12   and since then I've received several in-state and out-of-state

13   instructor updates.

14   Q.   Other than classroom instruction, do you do any other

15   type of instruction?

16   A.   Yes.  I teach the physical and practical skills of

17   police defensive tactics.

18   Q.   What is the purpose of the Boston Police Academy?

19   A.   The Boston Police Academy generally is -- the purpose is

20   twofold.  Number one, is to take recruits who come in as

21   civilians and we train them in a 27 -- 26- or 27-week course

22   and at the end of that course, they are sworn in as police

23   officers; and, secondarily, it's to train and update police

24   officers who are on the job, who are on duty, to train and

25   update them in a program called In-Service Training.

1    Q.   What is in-service training?

2    A.   In-service training is done periodically, usually every

3    year.  We call officers back from the field and give them

4    updates in different areas of training.

5    Q.   How often are academies held?

6    A.   Academies -- right now we're in a cycle where they're

7    held once a year.  Usually we start in December and we finish

8    somewhere around May or June, but in the past there have been

9    academies every two years.

10   Q.   How long do these academies last?

11   A.   They're 26 or 27 weeks.

12   Q.   How does one get accepted to the Boston Police Academy?

13   A.   Well, initially for -- for a Boston police officer, they

14   take a civil service examination and then there is a

15   background examination and then they have a psychological

16   exam, a physical abilities test and a physical.

17   Q.   In order to become a Boston police officer, need a

18   Boston recruit pass the academy?

19   A.   Yes.

20   Q.   Does everyone pass the academy?

21   A.   No.

22   Q.   How many recruits have you trained during your time

23   period as an instructor?

24   A.   The estimate is about a thousand.

25   Q.   And during your time as an instructor, have you trained

1    the defendants in this case, Officer Celester and Officer

2    Jenkins?

3       A.   Yes, I have.

4       Q.   Officer Owens, are police officers authorized to make

5    arrests?

6       A.   Yes, they are.

7       Q.   What is the objective of arrest?

8       A.   The objective of an arrest is to safely place someone

9    who has been charged with a crime in custody.

10      Q.   Does an officer need to have control of that person in

11   custody?

12      A.   Yes.  Yes.

13      Q.   Why is that?

14      A.   Well, to keep that person from hurting the officers

15   during transport, from escaping or from hurting themselves,

16   depending on the nature of the offense that they're being

17   arrested for.

18      Q.   Is there more than one way to gain control of a person?

19      A.   Yes, there are many ways.

20      Q.   Describe some of them for me.

21      A.   Well, if the person is compliant, the person places

22   themselves under control.  If the person is passively

23   resistant, that means offering no real muscular resistance,

24   the officer lifts, supports, guides and directs their hands

25   into a position to be cuffed.  If they're actively resistant,

1    the officer will have to use some kind of compliance technique

2    to persuade them to be cuffed.  If they're assaultive, the

3    officer has to escalate to defend himself or other people

4    against the assault, and if they are a lethal threat, the

5    officer is authorized to use deadly force.

6    Q.    You mentioned compliance techniques.  What are those?

7    A.    Compliance techniques -- I colloquially refer to them in

8    my classroom as "the pain deal."  The subject is resisting.

9    The officer would offer some temporary pain technique with no

10   long-lasting effects to persuade them to do what the officer

11   is trying to get them to do.

12   Q.    And, again, under what circumstances would an officer

13   use compliance techniques?

14   A.    If the person is actively resisting.  That means they

15   are pulling away, running, squirming, locking their arms in a

16   position where the officer can't get.  The compliance

17   techniques are offered to get -- to distract the mind to get

18   that person to be more easily handcuffed.

19   Q.    And you mentioned that there was one step above if

20   someone is simply resisting, there's assaultive conduct?

21   A.    Yes.

22   Q.    What is assaultive conduct?

23   A.    Assaultive is if there is an attack that's ongoing or

24   imminent against the police officer or against another

25   civilian.  For that, the officer is authorized to use what we

1   call defensive tactics.  It's the name of the broad course,

2   but it's the name of this particular use of police force that

3   the officer is allowed to use, strikes, takedowns, and the

4   goal of those things is to discontinue that person's attack or

5   assault.

6   Q.   What are some examples of assaultive conduct?

7   A.   Well, they can start very minimal.  They can start with

8   a person getting into what most people call a fighting stance,

9   which is a physical position that a person gets to before they

10  throw a punch.  For instance, I couldn't just throw a punch

11  sitting in this chair.  I'd have to get myself ready.  Up to

12  the officer seeing the person actually striking someone else

13  or striking the officer.  Those things are on that level of

14  the defensive tactics model, the use-of-force model.  Those

15  are assaultive behaviors.

16  Q.   And you mentioned that when an officer is met with an

17  assaultive suspect, he is allowed to use defensive tactics?

18  A.   Yes.

19  Q.   What are the defensive tactics?

20  A.   Defensive tactics, they're strikes, takedowns, use of

21  intermediate weapons, all of those things that the officer

22  would use to defend or protect themselves and to discontinue

23  the assault.

24  Q.   What are intermediate weapons?

25  A.   Intermediate weapons -- batons and pepper spray are

1   intermediate weapons.

2   Q.   Are officers permitted to use handcuffs when arresting

3   someone?

4   A.   Yes, they are.

5   Q.   Why?

6   A.   Well, one of the things -- one of the principles we

7   teach is that the hands are the most dangerous part of the

8   human body when we're making an arrest.  We call it the -- the

9   number one focus for the officer is to control the hands

10  because people use their hands to hurt other people.

11  Q.   What training do officers receive in terms of using

12  handcuffs?

13  A.   It's part of my course.  So, it's -- it's not the first

14  temporal lesson.  It's not the first in time, but it's one of

15  the most important lessons because we want everyone to go into

16  handcuffs and it's a really fine motor skill.  So, we do a lot

17  of training on handcuffing.

18  Q.   Does the way in which handcuffs are applied to a person

19  depend on the person's level of resistance?

20  A.   Yes.

21  Q.   Explain that to the jury.

22  A.   Yes.  Well, we want the person -- we say that there's

23  six steps of proper handcuffing, immobilize, control.

24  Handcuff is the third step.  Then search warrant or transport

25  are subsequent steps.  We want the person to be immobilized,

1    motionless, still.  Control, we want their hands to be in a

2    position where we can handcuff the hands.  I can't handcuff

3    hands that are four and a half feet apart.  So, we want their

4    hands to be in a position where they can be handcuffed and

5    then the cuffs go on.

6         So, that step where I -- immobilize -- if the person is

7    compliant, they immobilize themselves.  We tell them turn

8    around, put your hands behind your back and stand still.  They

9    immobilize themselves.  If they're noncompliant, if their

10   resistance has escalated, the officers have to do the

11   immobilizing, just like control.  For a compliant person, my

12   first hand going on the person is control and then the

13   handcuff goes on with the second hand.  If the person is not

14   compliant, it may take more than one officer to control those

15   hands, and then the step of handcuffing.  If the person is

16   resisting heavily, it may take more than one officer to

17   control.  So, it really depends on the subject's level of

18   resistance.

19   Q.  You mentioned earlier use of force, that you're a

20   use-of-force instructor.  How is use of force taught at the

21   academy?

22   A.  Well, the use of force is really based on constitutional

23   amendments.  We use two court cases, really.  We use *Graham*

24   *vs. Connor* and *Tennessee vs. Garner*, but we break those down.

25   For educational purposes, we break those down on what we call

the use-of-force model and we teach from the use-of-force

model.  We don't necessarily go over the court cases because

they're not necessarily user friendly for the broad audience

that I have.  Some people would really get them and some

people would get lost in all of the details.  So, we break

them down on a couple of diagrams.

Q.   You mentioned the use-of-force model.

A.   Yes.

Q.   Can you describe that for the jury?

A.   Well, the use-of-force model is -- it's a full-color

diagram and it's for educational purposes only, and we have

different levels of officer perception.  The officers are

taught what the different levels of officer perception are,

and corresponding with those levels, we have different levels

of subject resistance and reasonable officer's response.

     So, for five levels, strategic, tactical, volatile,

harmful and lethal, the subject has different behaviors within

those levels and the officer has different responses within

those levels.

Q.   So, the perceived subject actions, what are those?

A.   Perceived subject actions, they're categories.  For

instance, the lowest level is compliant.  That's the yes

person, the person who is going to -- the officer says stand,

sit, hands behind your back, that's a compliant person.

That's what they're going to do.

1          The next level is passive resistance.  That's a person I

2   mentioned before that's offering no mechanical -- mechanically

3   enhanced defiance.  They're not using their body to not do

4   what the officer says.  They're just not doing anything, that

5   the officer may say stand, sit, turn around, put your hands

6   behind your back.  The passively resistant subject will do

7   nothing, for many reasons.  We don't know what the reasons

8   are.

9          The next level is active resistance.  Now, the person

10  has begun to enhance their defiance by using their muscles and

11  skeleton.  They're using some kind of physical energy to

12  enhance their defiance, and then there's assaultive where an

13  attack is imminent or ongoing, and then the final level is

14  lethal, assaultive serious bodily injury, death, where the

15  assault has escalated to a point where the officer reasonably

16  feels that someone could be seriously injured or killed by the

17  resistance.

18  Q.   Does the officer's response depend upon the level of

19  perception that the subject is giving them?

20  A.   Yes.  The officer has to quickly interpret what the

21  subject is doing and they respond, what we say, on level.

22  Q.   So, if a subject is assaultive, what is the on level

23  response of a police officer?

24  A.   Defensive tactics.

25  Q.   And if someone is assaultive, does a police officer need

1   to use less force than necessary or can they jump right to

2   defensive tactics or how does that work?

3    A.   Well, the officer -- contrary to some older teaching on

4   the subject, people don't have -- the officer doesn't have to

5   climb a ladder.  In other words, the officer can see the

6   person -- can reasonably interpret that the person is

7   assaultive.  He doesn't have to try the lower level uses of

8   force, the lower level responses to get to defensive tactics.

9   He can respond on level.

10   Q.   Why is it important for an officer to bring someone

11   under control?

12   A.   Well, there's many reasons why an officer needs to bring

13   someone who is under arrest under control.  We want -- the

14   longer the situation goes, the more likely it is that someone

15   can get hurt.  So, long fights like you see in the movies,

16   they're really -- we really don't teach those.  Those don't

17   really happen.  We want officers to quickly gain control --

18   respond on level so they can quickly gain control of a

19   resistant subject because the longer it goes, the more

20   dangerous it is.

21   Q.   When an officer is being assaulted, then is he allowed

22   to defend himself?

23   A.   Yes.

24   Q.   You mentioned earlier the use of intermediate weapons

25   and you mentioned a baton?

1    A.   Yes.

2    Q.   What are officers trained in terms of using a baton?

3    A.   The officers -- the baton is a lengthy part of our

4    instruction because we're teaching them to use a tool, a tool

5    that most people haven't learned.  So, we teach them how to

6    draw the baton, both in a non-stressful situation and in a

7    dynamic confrontation, they learn how to draw the baton.  Then

8    they have to learn how to extend the baton, and then they have

9    to learn a platform from which to strike with the baton, and

10   then we teach them body targets for the baton.

11   Q.   When is an officer --

12        THE COURT:  Excuse me.

13        How does a police officer carry the baton?

14        THE WITNESS:  A police officer is usually trained,

15   your Honor, to carry the baton opposite side of their firearm.

16   So, the baton draw would be a cross -- we call a cross draw.

17   So, the firearm -- I'm a left-handed officer.  I set my

18   firearm up on my left hip and my baton is on my right hip.

19   So, when I want my baton, I --

20        THE COURT:  Is it in a sheath?

21        THE WITNESS:  It's in a sheath, yes, plastic sheath.

22   It takes a little energy to get it out because it's really

23   secure in there.  So, you have to give it a little twist, hold

24   the sheath and pull it out.

25   Q.   When is an officer authorized to use a baton?

1    A.   The officer is authorized to use a baton per our rules

2    to defended themselves or others against an assault.  So,

3    that's per the rule, and also, per the model, it's when the

4    subject is assaultive.

5    Q.   And you mentioned that there are certain body areas that

6    they are supposed to strike?

7    A.   Yes.

8    Q.   Can you talk about that a bit?

9    A.   Yes.  Well, there's been a little -- there's been a

10   slight change in training.  However, the primary target of

11   baton strikes is the leg.  It's a huge area.  It's pretty

12   resistant to serious injury if struck by a baton, but it's

13   sufficient to stop someone from assault.  So, our primary

14   target is the leg.  Secondary targets are things like the arms

15   and the hands, although a lot of officers really elect not to

16   use those targets.  Officers typically strike to the legs.

17   That's where most of our training is geared for striking.

18   Q.   And why is a leg a preferable spot as opposed to a head

19   or groin?

20   A.   A head, for instance, would only be preferable in a

21   lethal-force encounter between an officer and a subject to

22   strike with a baton.  The baton used -- a guy my size striking

23   someone in the head with a baton or anybody's size, really,

24   could cause serious to permanent bodily injury, which fits the

25   definition of lethal force, which means that my subject or my

1    target would have to be a lethal threat to me to strike in the

2    head.  The legs, however, huge -- huge target area, very

3    accessible as far as targeting goes, and it's not really a

4    lethal -- it's not going to cause -- if I hit someone in the

5    thigh, it's a big bone, covered by big muscles, with some

6    nerves running through it.  The nerves are going to give me

7    the sufficient pain that I want, but without causing --

8    usually without causing serious to permanent bodily injury.

9         And you asked about the groin.  I'm sorry.  The groin

10   isn't safe.  The groin is a lower level of result of trauma

11   than a strike to the head.  The groin could lead -- is an

12   escalation of trauma on the subject.  So, we tend to avoid the

13   groin with the baton.

14   Q.    Thank you.

15         Are you familiar with Boston Police Department Rule 304?

16   A.    Yes, I am.

17   Q.    What is Boston Police Department Rule 304?

18   A.    Boston Police Department Rule 304 is our rule that

19   covers the use of nonlethal force.

20   Q.    And is the use-of-force model continuum that you were

21   talking about earlier reflected in Rule 304?

22   A.    Yes, it is.

23   Q.    And under Rule 304, an officer is allowed to use

24   defensive tactics when he's met with an assaultive suspect?

25   A.    Yes.

```
 1              MS. O'CONNOR:  Thank you, Officer Owens.  I have
 2    nothing further.
 3              MR. PAPPAS:  Briefly, your Honor.
 4              THE COURT:  Mr. Pappas.
 5              MR. PAPPAS:  Thank you.
 6                        CROSS-EXAMINATION
 7    BY MR. PAPPAS:
 8    Q.   I'm sorry.  It was Officer Owens?
 9    A.   Yes, sir.
10    Q.   Good morning.
11    A.   Good morning.
12    Q.   Officer Owens, were you summoned to be here today?
13    A.   I was.
14    Q.   Summoned by the City of Boston Law Department?
15    A.   Yes.
16    Q.   Have you testified for them before?
17    A.   Not in trial.
18    Q.   Not in a trial.  So, what settings have you testified?
19    A.   I've been deposed.
20    Q.   You've been deposed before?
21    A.   Yes.
22    Q.   And you've been an academy instructor, you said?
23    A.   Yes, sir.
24    Q.   For how long?
25    A.   Well, 1995 is my first recruit class.  So, from 1995
```

1    until now with a four-year sabbatical.  I took four years off

2    the job.

3      Q.   You have no personal knowledge of the events which

4    occurred that gave rise to this case, correct?

5      A.   No personal knowledge, that's correct.

6      Q.   You did not review any documents that were generated as

7    a result of this case, correct?

8      A.   I did read the report.  I read a report written by one

9    of the officers.

10     Q.   And you know Officer Jenkins and Mr. Celester, correct?

11     A.   I do.

12     Q.   And have you had a chance to speak with them?

13     A.   The first time we spoke in a couple of years was on the

14   elevator ride arriving to court this morning.

15     Q.   Now, you testified that you're familiar with Rule 304,

16   correct?

17     A.   Yes, sir.

18     Q.   As the academy instructor on the use of force, you must

19   be very familiar with that rule, right?

20     A.   I would say more than the average bear, yes, sir.

21     Q.   Now, as you testified on direct, that rule does allow an

22   officer to use force in certain circumstances?

23     A.   That's correct.

24     Q.   You would agree that the use of force should be

25   necessary, correct?

1    A.   Correct.

2    Q.   And should be reasonable?

3    A.   Yes.

4    Q.   And by "reasonable," the rule actually states "within

5    reason," correct?

6    A.   Yes.

7    Q.   And it should be moderate force?

8    A.   Yes.

9    Q.   And fair action that's suitable for the confrontation?

10   A.   Yes.

11   Q.   The rule also discusses excessive force, right?

12   A.   Yes.

13   Q.   What is your understanding of excessive force?

14   A.   My understanding of excessive force is that amount of

15   force which is superior to the officer's perception and the

16   officer's perceived -- the officer's perception of subject

17   action.

18   Q.   So, in other words, you would agree with me that

19   excessive force would be force that's unreasonable under the

20   circumstances?

21   A.   Correct.

22   Q.   Now, you testified that one of the courses that you

23   teach is called defensive tactics, right?

24   A.   Yes, sir.

25   Q.   And it's not called offensive tactics, correct?

1    A.   That's correct.

2    Q.   Because you certainly don't teach the officers to use

3  any type of offensive tactics, right?

4    A.   That's correct.

5    Q.   You don't teach them to attack suspects?

6    A.   That's correct.

7    Q.   You don't teach them to assault suspects or detainees,

8  correct?

9    A.   No criminal -- I don't teach them to commit a criminal

10 assault against a subject.

11   Q.   Now, you don't teach them to inflict pain upon anyone

12 they're arresting, right?

13   A.   There is pain involved.  From time to time there is pain

14 needed, but not unreasonable.

15   Q.   But you don't teach them specifically to inflict pain

16 once you handcuff an arrestee, correct?

17   A.   No, I can't think of a situation where I taught to

18 inflict pain on an arrestee --

19   Q.   The use of force that --

20   A.   -- handcuffs.

21   Q.   Thank you.

22        The use of force that you teach for these officers to

23 use during the course of their duties as officers, those

24 tactics are not used to inflict punishment on the arrestee,

25 correct?

1    A.   No, sir, they're not.

2    Q.   It's just basically to defend themselves, right?

3    A.   Yes.

4    Q.   And to make sure that they get the suspect under

5    control?

6    A.   That's correct.

7    Q.   And once the suspect is under control, the use of force

8    should stop?

9    A.   Typically, yes, sir.

10   Q.   So, if a person is handcuffed, it would be unreasonable

11   to drag that person in the parking lot, correct?

12   A.   I guess in most circumstances, yes, sir.

13   Q.   You certainly -- during your course of defensive tactics

14   at the academy, you don't teach them to grab a female by the

15   hair and pull their hair, correct?

16   A.   No, that's not a taught technique in my class.

17   Q.   You certainly don't -- strike that.

18        You talked about handcuffing, correct?

19   A.   Yes, sir.

20   Q.   You certainly don't teach the new recruits or officers

21   in their in-service training to pull hair of the suspect while

22   they're handcuffing them, correct?

23   A.   Correct.

24   Q.   In fact, the rules actually state that the improper use

25   of handcuffing can result in injury or potentially dangerous

1    situations to an arrestee, right?

2    A.   Correct.

3    Q.   So, you want to make sure they're using these handcuffs

4    properly, right?

5    A.   Yes, sir.

6    Q.   And some of the injuries that can result from the

7    improper handcuffing -- or excuse me -- rough handling of the

8    handcuffs could be injuries to the suspect's wrists?

9    A.   That's correct.

10   Q.   And that commonly happens with the misuse of handcuffs,

11   correct?

12   A.   I would assume so, yes.

13   Q.   You assume so.  You testified that you --

14   A.   I'm a little stuck on the "commonly."  I would assume

15   that it can happen with the misuse of handcuffs.  I haven't

16   seen a lot of cases of the misuse of handcuffs causing wrist

17   injury in my career.

18   Q.   Now, you testified that once the suspect is handcuffed

19   or restrained, the officer is typically allowed to guide or

20   direct that person, right?

21   A.   That's not the circumstance where I use guide and

22   direct.  I use guide and direct when I was talking about

23   passive resistance.  So, the person is passively resisting,

24   the officer's force is used to lift, support, guide or direct

25   that person.

1    Q.   So, once someone is handcuffed and restrained, the

2    officer is then allowed to guide and direct the person to

3    where he wants them to go?

4    A.   If the person -- if the handcuffs -- if the handcuffed

5    person is compliant at that point, yes.

6    Q.   And how would you teach -- or how were these officers

7    taught to guide and direct a person that is compliant at that

8    time?

9    A.   Well, we teach them post-handcuffing escort where the

10   officer would place one hand on the elbow and one hand either

11   on the wrist -- some officers elect to use the chain, but we

12   typically teach the wrist and the elbow and the officer guides

13   the person in that position.

14   Q.   You wouldn't teach -- you wouldn't teach these officers

15   to grab a person by the hair to direct them or guide them,

16   would you?

17   A.   No, sir.

18   Q.   Do you teach your officers to place their forearm or

19   fist up in the suspect's throat?

20   A.   No, sir.

21   Q.   Now, getting back to Rule 304 that you are more familiar

22   with than the average person.  You are aware that Section 7

23   discusses the investigation of use of force, correct?

24   A.   Yes, sir.

25   Q.   And who investigates the use of force?

1    A.   Usually a patrol supervisor would investigate use of

2    force.

3    Q.   And you are familiar that Section 7 of Rule 304 requires

4    that the officer using force should report it verbally to

5    their patrol supervisor, correct?

6    A.   Yes.

7    Q.   And that any officer who has used force shall then make

8    out a written report, correct?

9    A.   Yes.

10   Q.   And that written report should describe the incident,

11   right?

12   A.   Yes.

13   Q.   Detail the events, name all witnesses involved?

14   A.   Yes.

15   Q.   Including police officers, right?

16   A.   Yes.

17   Q.   And other civilian individuals that may have witnessed

18   the incident?

19   A.   That's correct.

20   Q.   And you would agree with me that this required written

21   report is so that the Boston Police Department can thoroughly

22   investigate the use of force, right?

23   A.   That's correct.

24   Q.   And without a verbal report or a written report, Boston

25   Police Department would be unable to investigate this use of

1  force, right?

2   A.   Typically, yes.  It would make the investigation more

3  difficult, yes.

4   Q.   And am I correct in saying that the investigations into

5  these use of force are helpful for individuals like yourself

6  who are training new cadets, right?

7   A.   Yes.

8   Q.   And also to train the officers that are currently

9  in-service?

10   A.   That's correct.

11   Q.   Now, you testified that you did have a chance to

12  instruct or train Officer Celester?

13   A.   Yes.

14   Q.   And when was that?

15   A.   I believe he was in Class 3095.

16   Q.   And in 1995?

17   A.   1995, yes.

18   Q.   Was he as big as he is now in 1995?

19   A.   He was as tall he is now.

20   Q.   As tall as he is now?

21   A.   Yes.

22   Q.   He was in pretty good shape in '95, though, right?

23   A.   Yes, he was.

24   Q.   He was in pretty good shape throughout his career with

25  the Boston Police Department, right?

1   A.   Yes, absolutely.

2   Q.   You certainly had no concerns with him handling himself

3   on the street with individuals, right?

4   A.   No, I didn't.

5        MR. PAPPAS:  No further questions, your Honor.

6        THE COURT:  No redirect?

7        MS. O'CONNOR:  Just briefly, your Honor.

8        THE COURT:  If there's brief redirect, there will be

9   recross.

10                  REDIRECT EXAMINATION

11  BY MS. O'CONNOR:

12  Q.   Officer Owens, you mentioned that you don't train people

13  to -- or train your officers to pull a suspect's hair,

14  correct?

15  A.   That's correct.

16  Q.   Are there circumstances when hair pulling might be

17  appropriate?

18  A.   Yes, there are.

19  Q.   And when an officer is met with a certain level of

20  resistance or assaultive behavior, should that officer return

21  the same level of behavior or is it preferable to up the ante

22  to the next step?

23  A.   Well, the officer should do what's necessary to control

24  the subject.  So, typically, that -- that means there does

25  have to be -- I'm resistant to say go up to the next level,

1  because we want them to respond on level, but we want them to

2  have some sort of -- we call it control superiority, that the

3  officer will control the resistance in a superior fashion from

4  the attack.

5     Q.   Why is it important for an officer to have this superior

6  authority?

7     A.   The control superiority creates a situation where the

8  attack or the imminent attack is ended quickly.  Again, we

9  want -- we want our officers to end these confrontations,

10  attacks quickly.  So, responding on level -- for instance, a

11  push, you pushed me, I push you.  We're going to be pushing

12  each other for a long time.  So, we want the attack to be

13  over.  And so, that's why we teach the control superiority

14  principle.

15     Q.   If a suspect bites an officer's hand, might that be a

16  situation where hair pulling might be appropriate?

17           MR. PAPPAS:  Objection, your Honor.

18           THE COURT:  No.  You may answer that.

19     A.   Yes.  Depending on the position of the officer and the

20  hair and the bite, and all that stuff, yes.

21           MS. O'CONNOR:  Thank you, Officer Owens.

22           THE COURT:  Any recross?

23           MR. PAPPAS:  No recross, your Honor.

24           THE COURT:  Thank you, Mr. Owens.  You're excused.

25           (Officer Owens steps down.)

```
1                    C E R T I F I C A T E

2            I, Catherine A. Handel, Official Court Reporter of

3    the United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 28, constitutes to the

5    best of my skill and ability a true and accurate transcription

6    of my stenotype notes taken in the matter of Civil Action No.

7    12-11344-RWZ, Dwayne Johnson, et al. versus Lawrence Celester,

8    et al.

9

10

11   December 6, 2015          /s/Catherine A. Handel
     Date                      Catherine A. Handel RPR-CM, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```